**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-cv-20532-ALTMAN/Reid**

**JUAN A. FRIAS**,

 *Plaintiff*,

*v.*

**SOCIAL SECURITY ADMINISTRATION**,

 *Defendant*.

_____/

**ORDER**

On November 21, 2019, our Plaintiff, Juan Frias, applied for supplemental social security income. *See* Social Security Transcript ("R.") at 169–75. After his application was denied twice—first on February 13, 2020, and then again on June 26, 2020—Frias appeared at a hearing before an Administrative Law Judge ("ALJ"). *See id.* at 82, 93, 49–66. After that hearing, the ALJ entered a written decision, concluding that "the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act." ALJ Decision at 13.[1] When the Social Security Administration ("SSA") Appeals Council refused to revisit the ALJ Decision, *see* R. at 7, Frias appealed that decision to us, *see generally* Complaint [ECF No. 1]. Frias then amended his complaint, *see* Amended Complaint ("Am. Compl.") [ECF No. 5], and we directed the parties to file cross-motions for summary judgment, *see* Scheduling Order [ECF No. 26]. Complying with this order, the SSA timely filed its Motion for Summary Judgment ("MSJ")

---

[1] The ALJ actually issued *two* decisions—an initial decision on January 4, 2021, *see* R. at 32–45, and an amended version on January 12, 2021, which incorporated an additional medical record the ALJ had received *after* the hearing, *see id.* at 12–28. Since the amended version includes everything the ALJ said in the original decision (plus a little more), *that's* the ALJ Decision we'll be reviewing here. And, since we cite it so often, we'll paginate it separately—*i.e.*, we'll refer to the first page of the ALJ Decision as ALJ Decision at 1, rather than R. at 12.

1

[ECF No. 29]. Frias, however, *never* filed his own motion and *never* responded to the SSA's MSJ.[2] After careful review, we now **GRANT** the SSA's MSJ and **AFFIRM** the ALJ Decision.

## STANDARD OF REVIEW

Our review of an ALJ's decision is "limited to an inquiry into whether there is substantial evidence to support the findings of the [ALJ], and whether the correct legal standards were applied." *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The latter determination—whether the ALJ applied the correct legal standard—is a legal one subject to *de novo* review. *Graham v. Bowen*, 90 F.2d 1572, 1575 (11th Cir. 1986) (citation omitted). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency [in Social Security appeals] is not high. Substantial evidence . . . is more than a mere scintilla.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ibid.* (cleaned up). In other words, we "may not decide the facts anew,

---

[2] Although the Plaintiff never responded to the SSA's MSJ, he *did* file several other, non-responsive documents on the docket. *See, e.g.*, Second Amended Complaint [ECF No. 27]; Stricken Third Amended Complaint [ECF No. 30]; Stricken Fourth Amended Complaint [ECF No. 33]; Stricken Motion Requesting Status of Summary Judgment [ECF No. 35]; Notice of Inquiry [ECF No. 37]. Even in these (now-stricken) complaints, Frias didn't identify any errors in the ALJ Decision. He, instead, simply reiterated his view that the SSA is withholding his benefits. *See, e.g.*, Compl. at 1 ("The Social Security Administration is holding benefits for case [\*\*\*-\*\*]-4082."); Am. Compl. at 4 ("The Social Security Administration is holding benefits for case [\*\*\*-\*\*]-4082."); SAC at 4 ("Statement of Claim: . . . to request S.S.I. and S.S.A. benefits[.]"). It's plainly not our job to make Frias's arguments for him. *See, e.g.*, *Patrick v. Warden*, 828 F. App'x 518, 522 (11th Cir. 2020) (noting that even the delicate task of liberally construing *pro se* habeas petitions "does not mean we are required to construct a party's legal arguments for him" (cleaned up)). Frias has thus forfeited any arguments he *could* have advanced in that briefing. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited].").

reweigh the evidence, or substitute our judgment" for the ALJ's—even if the "evidence preponderates against the [ALJ's] decision." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (cleaned up).

## ANALYSIS

As we've said, "[i]n Social Security appeals, we must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). We agree with the SSA *both* that the ALJ applied the correct legal standards *and* that the ALJ Decision was supported by substantial evidence.

*First*, the ALJ applied the correct legal standards. To qualify for disability benefits, a claimant must be disabled—in other words, he must suffer from "the inability to engage in a substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted and can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Act requires ALJs to address the following five-step inquiry:

> (1) [W]hether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functioning capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178 (first citing 20 C.F.R. § 404.1520(a)(4)(i)–(v); and then citing 20 C.F.R. § 416.920(a)(4)(i)–(v)). Our ALJ analyzed each of these five steps. *One*, she found that Frias was unemployed. *See* ALJ Decision at 4 ("The claimant has not engaged in substantial gainful activity since September 15, 2018[.]"). *Two*, she concluded that Frias suffers from a severe impairment. *Ibid.* ("The

3

claimant has the following severe impairments: depressive disorders; personality disorders; trauma and stressor related disorders; and substance abuse disorder[.]"). *Three*, she determined that Frias's impairments don't meet or equal any of the specific impairments listed in the applicable regulations. *Ibid.* ("Specifically, I have considered all of the impairments listed under 20 CFR Part 404, Subpart P, Appendix I, including the listings of mental impairments contained in § 12.00 . . . . I find that the claimant's mental impairments do not meet nor medically equal any listed impairment."). *Four*, she found that Frias *can* perform his past relevant work. *Id.* at 12 ("In comparing the claimant's residual functional capacity with the physical and mental demands of [his past relevant work], I further find that he is able to perform the job as it is actually and generally performed."). *Five*, she concluded that he *can* perform a full range of unskilled work at all exertional levels. *Id.* at 7 ("[Frias] has the residual functional capacity to perform a full range of work at all exertional levels[.]"). Based on these findings, the ALJ concluded that Frias *isn't* disabled. *See id.* at 13 ("The claimant has not been under a disability, as defined in the Social Security Act, from September 15, 2018, through the date of this decision[.]"). The ALJ, in short, applied the correct legal standard. *See, e.g., Wright v. Barnhart*, 153 F. App'x 678, 683 (11th Cir. 2005) (finding that "the ALJ clearly applied the correct legal standards" where she "followed this sequence correctly"); *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) ("An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'").

*Second*, the ALJ Decision was supported by "substantial evidence." At Steps One and Two, the ALJ determined that Frias hasn't engaged in substantial gainful activity since September 15, 2018, and that he suffers from "severe [mental] impairments . . . . [that] cause more than minimal limitations to the claimant's ability to perform basic work activities." ALJ Decision at 4. At Step Three, the ALJ found that these mental impairments "do not meet nor medically equal any listed impairment," *ibid.*—

4

this, despite the fact that his "mental impairment is nonetheless severe and results in functional deficits," *id.* at 7. In addressing Frias's mental impairments, the ALJ considered his depressive and personality disorders, his trauma and stressor-related disorders, and his substance abuse. *Id.* at 4–7. She then mapped these disorders out across the four "functional domains" outlined in the SSA regulations: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* at 5–6 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00 (listing the four "functional domains")). To be considered disabling, "a mental impairment must . . . result in an *extreme* limitation of one, or a *marked* limitation of two," of the four functional areas. *Id.* at 5 (emphasis in original). With respect to the first domain (understanding, remembering, or applying information), the ALJ observed:

> The claimant did not allege any difficulties with understanding or remembering. Indeed, he testified that he had a bachelor's degree in electrical engineering and communications, and did not exhibit any difficulties with cognitive functioning. . . . Moreover, psychiatric providers found the claimant had coherent speech; orientation x4; intact memory; a goal-directed thought process; intact memory; fair insight and judgment; and no disorganized thinking.

*Ibid.* (cleaned up). "Given the record as a whole," the ALJ concluded that Frias "has moderate deficits in ability to understand, remember or apply information." *Ibid.*

Substantial evidence supports this decision. So, for instance, the ALJ cited a "Report of Contact," in which an SSA representative interviewed Frias and found him "alert, coherent, logical, and in touch with reality." R. at 221. During that same interview, Frias reported that he "does not have any issues navigating the public transportation system," that he "uses Google maps," and that he "is able to ask questions [ ] (e.g., asking for directions)" when he needs to. *Ibid.* The ALJ also relied on other psychiatric records. For example, one psychiatrist found Frias "alert, o[riented] x3 [and] affect congruent," *id.* at 255, and another noted his "orientation" was "intact x4," his "memory [and] abstraction" were "intact," his "similarities" were "good," his "speech" was "coherent," and his "thought process" was "goal directed," *id.* at 295.

5

In the second domain (interacting with others), the ALJ found that Frias "has moderate deficits in interacting with others." ALJ Decision at 5. This finding was likewise supported by substantial evidence. Here, the ALJ noted Frias's own testimony "that he had no family or friends" and that he "had lost touch with many people because of going to jail." *Ibid.*; *see also* R. at 61 ("Q: Do you have any friends or family that you spend time with? A: No."). "However," the ALJ continued, "he stated that he liked playing baseball." ALJ Decision at 5; *see also* R. at 61 ("I like baseball. I've played baseball all my life."). And, in an SSA interview, Frias reported that he had "a family member to help him out with a place to stay for about 2 months so that he can complete [a home confinement] program," and that "his family is paying his bills at this time." R. at 221; *see also* ALJ Decision at 5. Finally, as the ALJ noted, several psychiatric providers had opined that Frias was "calm," "cooperative," and "euthymic," R. at 283, with "no suicidal/homicidal ideation [or] auditory/visual hallucinations," and no delusions, obsessions, or compulsions, *id.* at 283–84. We thus will not second-guess the ALJ's view that Frias exhibited only "moderate deficits" in "interacting with others"—specifically, moderate deficits "relat[ing] to and work[ing] with supervisors, co-workers, and the public[.]" ALJ Decision at 5.

In the third functional domain, the ALJ concluded that Frias has "moderate deficits in ability to maintain concentration, persistence and pace." *Id.* at 6. This, too, was supported by substantial evidence. Here, the ALJ noted that Frias "did not allege any difficulties with concentration and responded appropriately to questioning during the hearing." *Id.* at 5; *see also generally* R. at 51–61. She also recounted his testimony "that he typically followed his probation officer's instructions; regularly made calls to follow-up on the Green Shirt Program[3] enrollment; used Facebook to communicate with his son; and computer programming was one of his hobbies." ALJ Decision at 5–6; *see also* R. at

---

[3] In his testimony, Frias explained that the Green Shirt Program was an initiative through which people could "obtain shelter by the city." R. at 57.

6

57 ("So I've been doing this process, and following instructions from my PO and from my advisors on how to do the process accordingly."); *id.* at 58–59 ("I call every day to look for shelter. . . . I call him every Monday."); *id.* at 61 ("So I try to make a Facebook to try to have some type of communication with my son."); *ibid.* ("I had a lot of hobbies. Well, I like computers. I like programming."). Plus, the ALJ observed, Frias's testimony was consistent with the opinions of his psychiatric providers: As we've said, one mental-health provider found him "alert, o[riented] x3 [and] affect congruent," *id.* at 255, and another noted that his "orientation" was "intact x4"; his "memory [and] abstraction" were "intact"; his "similarities" were "good"; his "speech" was "coherent"; and his "thought process" was "goal directed," *id.* at 295.

The ALJ concluded by assessing the fourth functional domain (adapting or managing oneself, *see* ALJ Decision at 6). Here, "[g]iven the record as a whole," the ALJ found "that [Frias] has mild deficits in ability to adapt and mange himself." *Ibid.* Again, this finding was supported by substantial evidence. As the ALJ pointed out, Frias "did not allege any difficulties with adapting or managing himself," *ibid.*; instead, he testified that he "follow[s] instructions from [his] P[robation] O[fficer] and from [his] advisors," R. at 10; that he "constantly – [he] call[s] every day to look for shelter," *id.* at 11; and that he's "trying to find ways to be able to communicate with [his] son," *id.* at 13. The ALJ also observed that Frias showed "no difficulties with maintaining personal hygiene, could ask questions, and spent the typical day trying to get his life organized to be in compliance with a court order." ALJ Decision at 6; *see also* R. at 221 (noting that Frias "does not have any issues navigating the public transportation system," that he "us[es] Google maps," and that he "is able to ask questions [ ] (e.g., asking for directions)" when he needs to); *id.* at 57 ("So I've been doing this process, and following instructions from my PO and from my advisors on how to do the process accordingly."). The ALJ also credited Frias's testimony that he "cooked, went shopping, used the bus and Facebook, studied engineering, did computer programming and played baseball as hobbies, and did not sleep at all during

7

the day." ALJ Decision at 6. And, as we've highlighted, Frias's psychiatric providers found that he was "calm, cooperative," and "well groomed." R. at 298.

As this recitation makes plain, the ALJ considered *ample* evidence—including medical records, administrative records, and Frias's own testimony—in determining the scope and severity of Frias's mental limitations. We therefore conclude that "substantial evidence . . . support[s] the findings of the [ALJ]" with respect to the four functional domains. *Wilson*, 284 F.3d at 1221.

Still in Step Three, the ALJ asked whether Frias's mental impairment was "serious and persistent." ALJ Decision at 6. To conclude that his impairment was "serious and persistent," the ALJ needed to find that three things were true: (1) that the impairment had lasted for "over a period of at least 2 years"; (2) that there was some "medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the disorder"; and (3) that Frias had shown some evidence of "marginal adjustment, that is, minimal capacity to adapt to changes in environment or to demands that are not already part of daily life." *Ibid.* (cleaned up). The ALJ bypassed the first question and began with the second and third.[4] *Id.* at 7. "The record does not," in the ALJ's view, "establish that [Frias] resides in a highly structured setting or is incapable of making an adjustment to a vocational setting." *Ibid.* She thus did "not find evidence of an inability to adjust to changes in [his] environment[.]" *Ibid.*

Again, substantial evidence supports this conclusion. As far as "resid[ing] in a highly structured setting," Frias testified that he was homeless and that he was constantly searching for stable shelter. *See* R. at 58–59. By his own admission, then, he didn't reside in a highly structured setting. As for his

---

[4] Although the ALJ didn't directly decide whether Frias's condition persisted for more than two years, we don't think the record supports a finding that it did. The hearing, remember, was on November 4, 2020, *see* R. at 49, and Frias's *earliest* psychiatric care came in October of 2019, when he first saw Dr. Borrega, *see id.* at 255–57. That's just over *one* year. Moreover, as we've said, the ALJ lamented that the record has "no evidence of any treatment for the entire first year of the period at issue." ALJ Decision at 8. There is, then, no evidence that Frias's condition lasted more than two years.

ability "to adjust to changes in his environment" or "to a vocational setting," Frias explained that he'd graduated from both high school and college (where he earned a bachelor's degree in electric engineering and communications, *id.* at 56), and that he'd held jobs as a maintenance technician, a retail-machine installer, a furniture deliveryman, an account manager, and a laminator, *id.* at 54–55. Frias, in other words, appears to be able to adjust to changes in his environment. *See* ALJ Decision at 7 ("Given the record, I do not find evidence of an inability to adjust to changes in the claimant's environment as called for by [the applicable regulations]."); *see also Biestek*, 139 S. Ct. at 1154 ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency [in Social Security appeals] is not high. Substantial evidence . . . is more than a mere scintilla.'").

Balancing all this—the limitations in all four functional domains, the duration of Frias's mental impairment, the relative effectiveness of therapeutic efforts, and Frias's proven capacity to adapt—the ALJ found that Frias's mental impairment was "nevertheless severe and results in functional deficits[.]" ALJ Decision at 7.

In Step Four, the ALJ determined that Frias "has the residual functional capacity to perform a full range of work at all exertional levels[.]" *Ibid.* She did find, though, that he was subject to the following "nonexertional limitations":

> He can apply commonsense understanding to carry out detailed but uninvolved written or oral instructions, within the scope of Reasoning Level 2. The claimant can respond to demands and adapt to changes in a work setting, and work at an appropriate and consistent pace. He can occasionally interact with supervisors, co-workers, and the general public.

*Ibid.* The ALJ based this conclusion on her thorough review of Frias's mental-health history, including "all symptoms . . . the objective medical evidence . . . [and] the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c." *Id.* at 7–11. In considering Frias's symptoms, the ALJ followed a two-step process. *First*,

9

she "determined whether there is an underlying medically determinable physical or mental impairment . . . that can be shown by medically acceptable clinical or laboratory diagnostics techniques—that could reasonably be expected to produce [Frias's] . . . symptoms." *Id.* at 7. *Second*, she "evaluate[d] the intensity, persistence, and limiting effects of [Frias's] symptoms to determine the extent to which they limit [Frias's] work-related activities." *Ibid.* For purposes of this assessment, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence," the ALJ looked for "other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." *Ibid.*

With respect to Frias's mental impairments, the ALJ found, among other things, that: (1) "he alleged in a November 2019 Disability Report that he stopped working on September 15, 2018 due to mental problems. However, the medical record suggests that *he may have stopped working due to a 1-year incarceration*," *ibid.* (cleaned up); *see also* R. at 205 ("When did you stop working? 9/15/2018. Why did you stop working? Because of my condition(s)."); R. at 250 (noting, on October 10, 2019, that Frias was "in a halfway house since 08/27[/2019] after released [sic] from prison where he was for less than a year"); (2) since the onset of his disability, Frias had been "studying engineering and engaged in activities of daily living ('ADLs') including independent personal hygiene and grooming, cooking, shopping, using Google maps and the bus, and navigating the transportation system," ALJ Decision at 8; *see also* R. at 61 (Frias testifying that "I had a lot of hobbies. Well, I like computers. I like programming. I like my field and my career. I like baseball. I've played baseball all my life."); *id.* at 221 (noting that Frias "does not have any issues navigating the public transportation system," including "us[ing] Google maps," and that he "is able to ask questions [ ] (e.g., asking for directions)" when he needs to); (3) Frias testified that his "psychotropic medication and marijuana were helpful, and [Frias's] therapist was very helpful when he was feeling stressed," ALJ Decision at 8; *see also* R. at 59–60 ("Q: And are the medications helping you? A: Yes. Especially the marijuana is helping me[.] . . . Q: And are

they helping you at Dade Family Counseling? . . . A: Yes. Yes. Taffy is very helpful. She's very helpful."); and (4) "the claimant did not exhibit any difficulties with cognitive functioning during the hearing," ALJ Decision at 8.

Based on a "careful consideration of the evidence," the ALJ found that Frias's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" *Ibid.* "[H]owever," the ALJ continued, "his statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" *Ibid.*

In searching through Frias's medical history, the ALJ uncovered a "dearth of treatment" and "no evidence of any treatment for the entire first year of the period at issue." *Ibid.* So, for instance, while Frias's Bureau of Prisons records reflect that he saw a medical doctor and a dentist in 2019 for *other* health needs (for example, a chest x-ray, *see* R. at 266, and a dental exam, *see id.* at 267), "there is no evidence of any psychiatric complaints or treatment" during his incarceration, *see* ALJ Decision at 8. Once he was released to a halfway house, Frias underwent a psychiatric evaluation with Dr. Priscilla Borrego, who found the Plaintiff "sad" and "anxious," with "poor impulse control, poor concentration," and a propensity for auditory hallucinations and paranoid ideas. R. at 255. Dr. Borrego "issued diagnoses of bipolar disorder, PTSD, and schizophrenia disorder, bipolar; and prescribed psychotropic medication." ALJ Decision at 8; *see also* R. at 255 ("Diagnostic Impression[:] AXIS I Bipolar II Disorder, Depressed[;] AXIS I PTSD[;] AXIS I Schizophrenia Disorder, Bipolar[.]"). Still, as the ALJ pointed out, Dr. Borrego "also noted that [Frias] was alert, cooperative and oriented x3, with no suicidal/homicidal ideation." ALJ Decision at 8; *see also* R. at 255 ("Alert, O[riented]x3, cooperative, mood is sad, anxious. Affect congruent. . . . +A[uditory]/H[allucinations], paranoid ideas, Denies suicidal/homicidal ideas or plan."). It therefore "appears," the ALJ wrote, "that [Dr. Borrego's] findings were *primarily based on his self-report.*" ALJ Decision at 8 (emphasis in original). Indeed, between

11

October and November of 2019, Frias attended five sessions with Dr. Borrego—during *all* of which she found him "receptive to counselors' interventions while maintaining an open mind," even as he remained "ambivalent [about] obtain[ing] employment while at the half-way house" because "he wants to file for disability benefits once he completes the half-way house." R. at 253. In the end, "due to [Frias's] limited treatment received and history of poor decision making with mental health illness," Dr. Borrego gave only a "guarded prognosis." *Ibid.*

Then there were the records from Dade Family Counseling ("DFC"), where Frias was evaluated about four months after his last session with Dr. Borrego. *See* ALJ Decision at 9 ("About *4 months later* in March 2020, the claimant was evaluated at Dade Family Counseling after a referral by his probation officer." (emphasis in original)). According to those DFC notes, Frias reported "a history of P.T.S.D. . . . [that] medication was not helping" and said a "judge told [him] to do a disability process." R. at 294. Frias also told a DFC provider (in March of 2020) that he hadn't taken any medication since December 2019 (one month after his last appointment with Dr. Borrego). *See ibid.* Here's how the ALJ summarized (accurately, in our view) the DFC provider's notes from this first meeting:

> The claimant was alert, cooperative and well-groomed, with *ability to take care of himself*, a euthymic mood, congruent affect, and coherent speech. He also had normal eye contact and psychomotor; orientation x4; a goal-directed thought process; unremarkable thought content; intact memory and abstraction; good similarities; fair insight and judgment; and *no hallucinations, delusions*, obsession, compulsions, suicidal/homicidal ideation.

ALJ Decision at 9 (emphasis in original); *see also* R. at 295–97. At this first appointment, Frias "initially refused medication because he had conducted research and wanted it replaced with medical marijuana." ALJ Decision at 9; *see also* R. at 294 ("Patient reports made research and wants medical marijuana. 'That medication was not helping me. THC is legal.'"). But "the provider prescribed psychotropic medication and recommended bi-weekly psychotherapy." ALJ Decision at 9; *see also* R. at 294 ("Patient refused meds but medical marijuana, but later agreed to Prozac, Seroquel[.]"); *id.* at

12

297. Frias then didn't return for some three months—until June of 2020. *See* ALJ Decision at 9 ("The claimant was encouraged to comply with medication and treatment; however, there is no evidence of a return until *3 months* later in June 2020[.]" (emphasis in original)).

At that second appointment, the provider observed that Frias was "[c]alm and cooperative. Patient reports 'Good, got the medical marijuana card and 1 month taking it, feeling better, prescribed by Dr. Luis Dominguez, much better sleeping and good appetite.'" R. at 298. Frias (according to the doctor) "had a generally benign examination including no psychosis, disorganized thinking, acute distress, or suicidal/homicidal ideation," and the provider "documented that s/he would taper off medication slowly because the claimant was on medical marijuana prescribed by another physician." ALJ Decision at 9; *see also* R. at 298 ("Patient is in no distress, not disorganized . . . . On assessment adamantly denies suicidal ideation, denies homicidal ideation, pt also denies Auditory or Visual hallucinations."); *id.* at 300 ("Taper off medication slowly. Re: patient on medical marijuana by another physician. Discontinue Prazosin, Decrease Seroquel to 25 mg HS, Buspar 10 mg BID[.]"). Notably, although the DFC provider advised Frias to return for another appointment the following month, *see* R. at 300 ("Return in one month[.]"), this June 2020 appointment is the *last* evidence we have on this record of any mental-health treatment before the ALJ issued her initial decision on January 14, 2021, *see id.* at 40 (the original ALJ Decision, dated January 14, 2021, noting "no evidence of any treatment in the *last 6 months* was found in the record"). After the hearing, however, DFC sent the ALJ an additional record, which showed that Frias had gone to one more appointment at DFC in December of 2020.[5] *See id.* at 302–06.

---

[5] That's why the ALJ amended her original decision. *See* ALJ Decision at 1–2 ("The claimant informed the Administrative Law Judge about additional written evidence at the hearing. . . . On December 17, 2020, additional new evidence was received and proffered; and the claimant responded that he had no additional comments. . . . This AMENDED decision replaces the January 4, 2021 decision, which did not consider the new evidence at Exhibit 8F [the December 2020 DFC record].").

At this third session, the DFC provider recorded that Frias was "not in acute distress," that he was (again) "[c]alm and cooperative," and that "[he] reports feeling okay, no medications since 1 month ago, and having paranoia and anxiety, my P.O. stressed me out since no medication going bad, not depressed, fair sleeping and good appetite." *Id.* at 302. Frias was, as before, "well groomed," "cooperative," "euthymic," "congruent," and "alert"—with "intact" memory, "coherent" speech, and a "goal-directed" thought process. *Ibid.* The DFC provider therefore "encouraged compliance with medications as needed," discussed "psychoeducation and good sleep hygiene," and conducted "brief supportive psychotherapy." *Id.* at 304. The DFC thus diagnosed Frias with "unspecified mood disorder vs GAD . . . PTSD by history . . . [and] S[ubstance] U[se] D[isorder.]" *Id.* at 297. But, as the ALJ observed, the DFC providers were clear that, "other than impaired concentration, [Frias's] mental status examination findings were *completely benign*." ALJ Decision at 9 (emphasis added); *see also ibid.* ("He was also calm with *no hallucinations*, disorganization, or acute distress. Additionally, the claimant again had an unremarkable mental status examination, including continued ability to take care of himself." (citing R. at 302–06 ("[N]ot in Acute Distress. Calm and cooperative. Patient reports 'feeling okay, no medications since 1 month ago, and having paranoia and anxiety . . . denies suicidal ideation, denies homicidal ideation, pt also denies Auditory or Visual hallucinations . . . well-groomed . . . normal . . . cooperative . . . euthymic . . . congruent . . . alert . . . coherent . . . goal-directed[.]"))).

Based on her review of these records, the ALJ concluded that "the objective medical evidence record indicates the claimant is able to perform the residual functional capacity delineated above. He testified to limitations caused by his impairments; however, nothing in the record demonstrates they limit him any more than assessed." *Ibid.* In saying so, the ALJ noted (again) the "paucity of records and multiple long gaps in treatment, including for the first 1-year [sic] of the period at issue and about half of 2020." *Ibid.* "[The record] also shows," she continued, "that the claimant improved and his reported hallucinations and PTSD symptoms resolved with conventional treatment." *Ibid.* She based

14

this conclusion *both* on Frias's "consistent generally benign examination findings" *and* on his own testimony that "medication and marijuana helped." *Ibid.* As the ALJ pointed out, "June 2020 clinical notes show that, at his request, he was tapered off psychotropic medication. On his return about 6 months later in December 2020, further demonstrating that his symptoms are controlled with medication, the claimant admitted that they had worsened when he stopped taking it." *Id.* at 9–10. Finally, the ALJ said, "symptoms notwithstanding, it appears that the claimant stopped working due to an incarceration and not his impairments." *Id.* at 10.

At the hearing, Frias did nothing to rebut these impressions. On the contrary, "his explanation for inability to work was that he had been advised to first address his legal issues." *Ibid.* Indeed, at the hearing, the ALJ asked Frias "why you believe you can't work a full time job?" R. at 56. And he responded, *not* by citing any disability, but by admitting: "I was told I'm a liability, according to the records. So I was advised by a big group of people that I need to get my life organized, and get things straightened out[.]" *Ibid.* Not content to let things lie, the ALJ pressed him for further details: "I'm reading your medical records – some Judge told you to apply for disability. Is that what you're talking about?" *Ibid.* "Yes," Frias concurred. "Yes." *Ibid.* We agree with the ALJ that this testimony, especially together with "the claimant's continued engagement in A[ctivities of] D[aily] L[iving,] . . . further belies the degree of severity alleged." ALJ Decision at 10.

But the ALJ went on. Still in Step Four, she considered the opinions of the SSA's medical experts, *id.* at 10–12, and was "somewhat persuaded by DDS psychological consultants Dr. Theodore Weber, PsyD, PhD and Dr. Julie Bruno, PhD," *id.* at 10. Dr. Weber, at the initial level, had opined that "there [was] insufficient evidence to evaluate [Frias's] claim." R. at 71. And, at the reconsideration level, Dr. Bruno had observed that Frias had "understanding and memory limitations[,] sustained concentration and persistence limitations[,] social interaction limitations[, and] ability to adapt limitations"—most of these along the mild (and some in the moderate) range. R. at 86; *see also* ALJ

15

Decision at 10 ("Dr. Bruno opined the claimant had mild limitation in understanding, remembering or applying information; mild limitation in interacting with others; moderate limitation in concentration, persistence and pace; and mild limitation in adapting and managing oneself[.]"). The ALJ found these opinions "somewhat persuasive because of the consultants' program knowledge (familiarity with Social Security Rules and Regulations) and citation to relevant supporting evidence available at the time," and because they were "also generally consistent with the overall record including evidence of minimal treatment and multiple significant gaps in treatment . . . demonstrated improvement with conventional treatment; and resolution of reported psychosis." ALJ Decision at 10. These opinions, the ALJ continued, "are additionally supported by generally benign examination findings despite admitted medication non-compliance; clinical notes showing the claimant was tapered off psychotropic medication at his request; his subsequent admission of symptom control with medication and marijuana; and no evidence of any episode of decompensation or psychiatric hospitalization." *Ibid.*[6] "The opinions are further supported," the ALJ continued, "by evidence the claimant may have stopped working due to incarceration and not because of his impairments; his testimony that he was unable to work because he was advised to first address his legal issues; and his continued engagement in A[ctivities of] D[aily] L[iving] including studying engineering and computer programming as a hobby." *Ibid.*

In short, after confirming that her "residual functional capacity assessment is supported by a preponderance of the objective medical evidence contained in the record," the ALJ concluded that "[Frias's] allegations, which are unsupported and contradicted by findings in treatment notes, simply do not evidence disabling symptoms and limitations." *Id.* at 11. Frias, the ALJ thus found, "is capable of performing past relevant work as a Laborer, Stores. This work does not require the performance

---

[6] The ALJ admittedly didn't find these consultant opinions *entirely* persuasive because "the consultants did not have the benefit of the evidence at the hearing level, which indicates that there is some medical evidence in the record and the claimant is more limited than opined." *Id.* at 10–11.

of work-related activities precluded by [his] residual functional capacity[.]" *Ibid*. Because the ALJ determined that Frias could return to his old job (or one like it), she necessarily concluded that he wasn't disabled within the meaning of the Act. *Id*. at 13 ("[T]he claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines.").

At Step Five, the ALJ credited the Vocational Expert's testimony that "a person of the claimant's age, educational [sic], vocational background and residual functional capacity . . . is able to perform past relevant work as a Laborer, Stores, as actually and generally performed." *Id*. at 12; *see also* R. at 63 ("The laborer, stores has a reasoning level of 2, so, yes, he can perform the laborer, stores job."). "In addition," the ALJ continued, "there are other jobs that exist in significant numbers in the national economy that [Frias] can also perform, considering [his] age, education, work experience, and residual functional capacity[.]" ALJ Decision at 12. Here, the ALJ acknowledged that "[Frias's] ability to perform work at all exertional levels has been compromised by nonexertional limitations." *Ibid*. "To determine the extent to which these limitations erode the occupational base of unskilled work at all exertional levels," the ALJ "asked the vocational expert whether jobs exist in the national economy for an individual with [Frias's] age, education, work experience, and residual functional capacity." *Ibid*. In response, the vocational expert testified that "the answer is yes. We have Cleaner II . . . bottling-line attendants. . . . And we also have finisher. . . . These are examples, not an exhaustive list." R. at 63. Finally, the ALJ credited the VE's testimony that these jobs—the ones Frias *can* perform—are available in significant numbers in the national economy because (she explained) the VE's testimony on this issue "is consistent with the information contained in the Dictionary of Occupational Titles." ALJ Decision at 13. In the ALJ's view, then, "[Frias] has not been under a disability, as defined in the Social Security Act, from September 15, 2018, through the date of this decision[.]" *Ibid*.

17

The ALJ Decision is based on "[s]ubstantial evidence"—*i.e.*, "more than a mere scintilla." *Biestek*, 139 S. Ct. at 1154. In other words, to our "reasonable mind," the ALJ's body of evidence is "adequate to support [her] conclusion." *Ibid.* (cleaned up). And it's simply not our job to "decide the facts anew, reweigh the evidence, or substitute our judgment" for the ALJ's. *Bloodsworth*, 703 F.2d at 1239; *see also Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) ("We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner. . . . If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." (cleaned up)); *Miles v. Chater*, 84 F.3d 1397, 1401 (11th Cir. 1996) ("Because of the deferential standard of review applied to his decision-making, the ALJ's resolution will usually be the final word on a claimant's entitlement to benefits.").

\*   \*   \*

We, therefore, **ORDER AND ADJUDGE** as follows:

1. The Defendant's Motion for Summary Judgment [ECF No. 29] is **GRANTED**.

2. The ALJ Decision is **AFFIRMED**.

3. Pursuant to Federal Rule of Civil Procedure 58, final judgment will be entered separately.

4. The Clerk of Court shall **CLOSE** this case. All other pending motions are **DENIED as moot**. And all other deadlines are **TERMINATED**.

**DONE AND ORDERED** in the Southern District of Florida on March 31, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record